UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
ARION ANTHONY and KARRY CALDERON,

                      Plaintiffs,

              -against-

CITY OF NEW YORK, New York Police
Department Sergeant JAMES LEE, individually,
and Police Officer SANGWOO LEE, individually,

                      Defendants.
------------------------------------------------------------------ x

**SECOND AMENDED COMPLAINT**

Jury Trial Demanded

15cv6364 (PKC) (RER)

## NATURE OF THE ACTION

1.     This is an action to recover money damages arising out of the violation of Plaintiffs' rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION AND VENUE

2.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

3.     This Court's jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343.

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## JURY DEMAND

5.      Plaintiffs demand a trial by jury in this action pursuant to Federal Rule of

Civil Procedure ("FRCP") 38.

## PARTIES

6.      Plaintiff Arion Anthony (hereinafter "Mr. Anthony") is a citizen of

Queens County in the State of New York.

7.      Plaintiff Karry Calderon (hereinafter "Ms. Calderon") is a citizen of

Queens County in the State of New York.

8.      Defendant City of New York was and is a municipal corporation duly

organized and existing under and by virtue of the laws of the State of New York.

9.      Defendant City of New York maintains the New York City Police

Department (hereinafter "NYPD"), a duly authorized public authority and/or police

department, authorized to perform all functions of a police department as per the

applicable sections of the aforementioned municipal corporation, the City of New

York.

10.     Defendant Police Sergeant James Lee ("Sergeant James Lee"), at all

times relevant herein, was a duly sworn officer, employee and agent of the NYPD and

was acting under the supervision of said department and according to his official duties.  Sergeant James Lee is sued in his individual capacity.

11.     Defendant Police Officer Sangwoo Lee ("Officer Sangwoo Lee"), at all times relevant herein, was a duly sworn officer, employee and agent of the NYPD and was acting under the supervision of said department and according to his official duties.  Officer Sangwoo Lee is sued in his individual capacity.

12.     That at all times hereinafter mentioned Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State of New York and/or the City of New York.

13.     Each and all of the acts of the Individual Defendants were done by said Defendants while acting within the scope of their employment by Defendant City of New York.

## STATEMENT OF FACTS

14.     On January 27, 2013, Mr. Anthony and Ms. Calderon were driving at approximately 8:00 a.m. in Ms. Calderon's vehicle in East Elmhurst, Queens.

15.     Sergeant James Lee and Officer Sangwoo Lee turned on their red and blue flashing lights and pulled the vehicle to the side of the road.

16.     Mr. Anthony and Ms. Calderon's vehicle's trunk had a broken latch

which was visible to the casual observer.  Despite the fact that the trunk was unable to

lock, the trunk did not open on its own and required a person to open it.

17.     Defendants' first action after stopping the vehicle, before speaking to

Mr. Anthony and Ms. Calderon, was to open the vehicle's trunk and search it without

cause and without permission.

18.     Sergeant James Lee approached Mr. Anthony on the driver's side of the

vehicle and Officer Sangwoo Lee approached Ms. Calderon on the passenger's side.

19.     Officer Sangwoo Lee opened the passenger door without explanation

and ordered Ms. Calderon out of the vehicle.  Officer Sangwoo Lee told Ms. Calderon

to stand with her hands on the vehicle.

20.     As this was happening, Sergeant James Lee asked for Mr. Anthony's

license and the vehicle's registration.  Mr. Anthony produced the documents but

Sergeant James Lee refused to take them or look at them.

21.     Sergeant James Lee opened the driver's door without explanation and

ordered Mr. Anthony to step out and to put his hands on the vehicle.  Mr. Anthony

complied.

22.     When Mr. Anthony asked why, Sergeant James Lee asked if Mr.

Anthony was resisting arrest, and Sergeant James Lee touched his gun.  Mr. Anthony,

who had not known that he was being arrested, complied with Sergeant James Lee's

directive.

23.     On information and belief, Defendants' unconstitutional actions against Plaintiffs during the incident were substantially motivated by Mr. Anthony's exercise of his right to ask why Plaintiffs had been stopped, and Plaintiffs suffered injury as a result.

24.     Sergeant James Lee ordered Officer Sangwoo Lee to handcuff Mr. Anthony, which Officer Sangwoo Lee did.

25.     Once Mr. Anthony was handcuffed, Defendants made him sit on the sidewalk.

26.     Sergeant James Lee stated, in sum and substance, that he thought that the car looked like it had been stolen.

27.     Mr. Anthony and Ms. Calderon stated that the vehicle was not stolen and that the address on the vehicle registration matched Ms. Calderon's address as shown on her ID.

28.     Sergeant James Lee refused to look at Ms. Calderon's ID or the vehicle registration. Defendants' refusal to look at any of the records belied their claim that they stopped the vehicle because it "looked stolen."

29.     On information and belief, Defendants profiled Plaintiffs, who are black, for a stop without justification on the basis of their race. There are a number of facts in the record to support this allegation. First, Defendants themselves have long stated that they stopped the vehicle because it "looked" like something—stolen. There is

nothing in the record to indicate in what way the vehicle "looked stolen." Furthermore, once Defendants stopped the vehicle, they took no action that any reasonable officer would take to satisfy him/herself that a vehicle was or was not stolen. For example, Plaintiffs contend that Defendants did not radio in Plaintiffs' license plate to check whether the vehicle had been reported stolen. Also, Plaintiffs contend that Defendants never looked at their IDs or the vehicle registration. In fact, Plaintiffs allege that at some point, Defendants' lack of interest in the registration papers was so complete, the documents were blown away by the wind. Another reason why Plaintiffs allege that Defendants profiled them is because Defendants were assigned to investigate narcotics offenses at the time of the stop. Plaintiffs allege that Defendants' were acting in furtherance of this aim, not car theft investigation, when they searched the trunk of the vehicle even before speaking to Mr. Anthony and/or Ms. Calderon, to search the trunk of the vehicle and when they thoroughly searched the interior of the vehicle even after Mr. Anthony and Ms. Calderon had been removed. For these reasons and more, Plaintiffs allege that Defendants' claim that the vehicle looked stolen was pretextual for impermissible profiling that violated their equal protection rights.

30.    After Sergeant James Lee searched the vehicle without legal justification; without asking for or obtaining Mr. Anthony's or Ms. Calderon's permission; and without finding any contraband, Sergeant James Lee removed a tire iron from the

vehicle and considered aloud whether it was a weapon unlawful to possess.

31.     In light of Sergeant James Lee's perceived interest in finding a weapon to arrest Mr. Anthony for possessing, Mr. Anthony, who works in classic car rehabilitation and resale, remembered that had an Eddie Bauer pocket knife in his pants pocket that he bought from Target, and which he used in his work, and told Sergeant James Lee and Officer Sangwoo Lee about the knife.

32.     The Eddie Bauer pocket knife was lawful for Mr. Anthony to carry.  It was a common folding knife and nothing about its operation met the statutory definition of a knife unlawful to possess.

33.     Officer Sangwoo Lee retrieved the pocket knife from Mr. Anthony and stated that he would arrest Mr. Anthony for the knife.  Defendants conducted no tests on the Eddie Bauer knife at the scene to determine whether it was unlawful to possess.  On information and belief, Defendants never performed any such test on the knife, or else they would have known that it was a common folding knife that was lawful for Mr. Anthony to possess.

34.     Offer Sangwoo Lee also told Mr. Anthony and Ms. Calderon that the reason he and Sergeant James Lee originally pulled the vehicle over was because it had a broken headlight.  This was not true.  The vehicle's headlight was operational, but Defendants knew that they had to come up with a reason why they stopped the vehicle.

35.     Even if the vehicle had had a broken headlight, which it did not, N.Y.

V.T.L. § 375.2A provides that

> [e]very motor vehicle . . . driven upon a public highway
> during the period from one-half hour after sunset to one-
> half hour before sunrise or at any other time when
> windshield wipers are in use, as a result of rain, sleet snow,
> hail or other unfavorable atmospheric condition, and at
> such other times as visibility for a distance of one thousand
> feet ahead of such motor vehicle is not clear, shall display .
> . . at least two lighted head lamps on the front, one on each
> side, having light sources of equal power[.]

N.Y. V.T.L. § 375.2A.  On the day in question, the sun had risen at 7:10 AM; the

weather did not create special visibility problems; and police records show that the

vehicle was stopped at 9:17 AM.

36.     Sergeant James Lee and Officer Sangwoo Lee never compared the

vehicle registration address to the address shown on Ms. Calderon's ID.

37.     Because Defendants did not have a police vehicle designed to transport

an arrestee (further proof that they were working an investigative detail at the time of

the unlawful stop), they had to call a "cage car" to come and transport Mr. Anthony

to the precinct.  Then, once the cage car took Mr. Anthony away, one of the

Defendants drove their vehicle back to the precinct while the other Defendant drove

Ms. Calderon's family's vehicle to the precinct with all of her belongings (purse, keys,

wallet, etc.) inside of it, leaving Ms. Calderon stranded on the sidewalk alone.  The

only personal belonging she had was a telephone, which she used to call Mr.

Anthony's family, who told her to call a cab to their house and they would pay.

38.     On information and belief, the reason why Defendants drove Ms. Calderon's vehicle to the precinct, despite the fact that it was not evidence of any of the offenses for which Mr. Anthony was eventually charged, was because they wished to subject it to still more unlawful searches for contraband.

39.     Sergeant James Lee and Officer Sangwoo Lee sent their false statements to the District Attorney's Office, causing Mr. Anthony to be charged with and prosecuted for possession of a criminal weapon and disorderly conduct.   Initially Defendants' complaint did not include the fabricated violation of N.Y. V.T.L. § 3752A.  Defendants added that charge to a later version.

40.     Mr. Anthony pled not guilty.

41.     Mr. Anthony attended court between five and seven times over the next year.

42.     On November 18, 2013, a state court judge dismissed Mr. Anthony's charges.

43.     Mr. Anthony filed a complaint with the Civilian Complaint Review Board ("CCRB") with respect to Defendants' actions.

44.     On September 4, 2013, the CCRB's investigation substantiated Mr. Anthony's allegation that Sergeant James Lee had abused his authority when he searched the vehicle.

45.     Mr. Anthony suffered damage as a result of Defendants' actions. Defendants unconstitutionally deprived Mr. Anthony of his liberty, deprived him of equal protection under the law, invaded his privacy, damaged his reputation, caused him emotional distress and fear that manifested in physical ailments and more.  Mr. Anthony continues to suffer these damages.

46.     Ms. Calderon suffered damage as a result of Defendants' actions as well. Defendants unconstitutionally deprived Ms. Calderon of her liberty, invaded her privacy, damaged her reputation, caused her emotional distress and fear that manifested in physical ailments and more.  Ms. Calderon continues to suffer these damages.

47.     All of the above occurred as a direct result of the unconstitutional policies, customs or practices of the City of New York, including, without limitation, the inadequate screening, hiring, retaining, training and supervising of its employees, and due to a custom, policy and/or practice of: arresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals.

48.     The aforesaid incident is not an isolated incident.  The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as documented in civil rights actions filed in the United States District Courts in the Eastern and Southern Districts of New York as well as in New York State courts.  As a result, Defendant City of New York is aware (from said lawsuits as well as notices of claims and complaints filed with the NYPD's Internal Affairs Bureau and the CCRB) that many NYPD officers, including the Defendants, arrest individual persons in order to meet productivity goals and arrest quotas; arrest individuals for professional advancement, overtime compensation and/or other objectives outside the ends of justice; and/or falsely arrest individuals and engage in a practice of falsification of evidence in an attempt to justify the false arrest.

49.     The City's failure to properly train its police officers regarding what constitutes a gravity knife under New York Penal Law Section 265.00 rises to the level of deliberate indifference to the constitutional rights of people—like Mr. Anthony here—with whom the City knows with a moral certainty its police officers will come into contact.

50.     The City's failure in this regard demonstrates a particular disregard for individuals' constitutional rights in light of the fact that there is historical evidence of

police officers frequently inaccurately classifying lawful knives to be unlawful gravity knives.  This has been the subject of substantial comment by the press, legislators, courts and the public over the years.

51.    As preliminary backdrop, in 2010, the New York Court of Appeals found that a police officer must have a factual basis for believing that a knife is a gravity knife before arresting and causing an individual to be charged with possession of a gravity knife "as opposed to a pocket knife, craft knife, or other type of knife that does not fit the definition of a per se weapon as defined in Penal Law article 265." People v. Dryden, 15 N.Y.3d 100, 104 (2010) (citing to N.Y. Penal Law Section 265.00(5)'s definition of a gravity knife as a knife with a blade that "is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force" and that "when released, is locked in place by means of a button, spring, lever or other device").

52.    The Dryden Court's holding that the government must have a factual basis for believing a knife to be a gravity knife in order to properly charge an individual with gravity-knife possession seems to be self-evident.  Yet the press has reported some remarkable statistics relating to the City's gravity-knife-possession arrest practices.  One article states that "[o]ver the last decade, the NYPD has made more than 82,000 arrests where fourth-degree criminal possession of a weapon was the most serious charge.  Most of those arrests involved possession of blades.  In that

same time, there have been just more than 15,000 convictions," which amounts to an 18% conviction rate.   Chris Glorioso and Evan Stulberger, <u>I-Team: Many Knife Arrests In New York City, Few Convictions</u>, NBC New York Web site, May 28, 2015, <u>available at</u>

<u>http://www.nbcnewyork.com/news/local/Knife-Arrest-NYPD-Freddie-Gray-Illegal-Baltimore-Death-Police-Maryland-305378461.html</u> (last accessed February 5, 2016).  The press has also noted that the police's inaccurate designation of lawful knives as gravity knives has disproportionately impacted working people who procure and carry ordinary cutting tools for their jobs.  <u>See</u> Ian Millhiser, <u>New York Cops Are Jailing Handymen For Carrying This Common Pocketknife</u>, ThinkProgress, Sept. 24, 2015, <u>available at</u> <u>http://thinkprogress.org/justice/2015/09/24/3705061/new-york-cops-have-been-jailing-handymen-for-years-for-carrying-pocketknives/</u> (alleging that if certain study statistics are true, "gravity-knife offenses [have become] among the top 10 most prosecuted crimes in New York City") (last accessed February 7, 2016).  <u>See also</u> John Campbell, <u>How A '50s-Era New York Knife Law Has Landed Thousands In Jail</u>, The Village Voice, Oct. 7, 2014, <u>available at</u> <u>http://www.villagevoice.com/news/how-a-50s-era-new-york-knife-law-has-landed-thousands-in-jail-6662589#page-all</u> (last accessed February 7, 2016).

53.     In 2010, the Manhattan's District Attorney's Office undertook a large enforcement action against select knife retailers in the City pursuant to which it identified various knives sold by those retailers as unlawful gravity knives. When the American Knife and Tool Institute ("AKTI") later asked knife experts to examine the various knives called gravity knives by the Manhattan District Attorney's Office, the AKTI reported that knife experts found knives among them that did not meet the definition of a gravity knife provided in New York Penal Law 265.00. See

http://www.akti.org/news/call-to-action-nyc-manhattan-district-da-confiscates-legal-knives-from-retailers/ (last accessed February 5, 2016).

54.     In New York courts there have been numerous legal claims alleging improper gravity-knife arrests in the civil and criminal context, providing anecdotal and actual support for the fact that the wrong choice by police officers in designating a lawful knife as an unlawful gravity knife frequently causes the deprivation of a citizen's constitutional rights. See, e.g., U.S. v. Irizarry, 509 F. Supp.2d 198 (E.D.N.Y. 2007) (finding that the police did not have probable cause to arrest the arrestee for gravity knife possession); Miller v. City of N.Y., No. 11 Civ. 6663 (JSR), 2012 WL 2524248, at *6 (S.D.N.Y. June 26, 2012) (finding that a reasonable jury could conclude that the police officer lacked probable cause to characterize the plaintiff's knife as a gravity knife). In 2011, a lawsuit—still ongoing—challenged the constitutionality of

the City's application of the gravity-knife law on the grounds of vagueness.  <u>See</u>
<u>Copeland et al. v. Vance et al.</u>, No. 11 Civ. 3918 (KBF) (RLE) (SDNY).

55.     New York legislators have introduced various bills seeking to modify the
gravity-knife law in order to leave less room for individual police officer discretion in
deciding what makes a gravity knife.  One such recent bill, N.Y. Bill A09042, states
that a knife is not a gravity knife when it "ha[s] a . . . mechanism designed to create a
bias toward closure and that requires exertion applied to the blade by hand, wrist or
arm to overcome the bias toward closure and open the knife."  <u>See</u> N.Y. Bill A09042,
<u>available at</u>

<u>http://assembly.state.ny.us/leg/?default_fld=&bn=A09042&term=2015&Summary=</u>
<u>Y&Actions=Y&Votes=Y&Memo=Y&Text=Y</u> (last accessed February 7, 2016).

56.     The proposed "bias toward closure" amendment is patterned after the
United States Congress's 2009 amendment of the Federal Switchblade Act in order to
stop similar inaccurate classifications of lawful knives as unlawful gravity knives in the
context of federal customs enforcement.  <u>See</u> 15 U.S.C. § 1244(5) (stating that a knife
is not an unlawful gravity knife when the knife "contains a . . . mechanism designed to
create a bias toward closure of the blade and that requires exertion applied to the
blade by hand, wrist or arm to overcome the bias toward closure to assist in opening
the knife").

57.     The City's failure to provide its police officers with sufficient gravity-knife training causes the widespread violation of individuals' constitutional rights and has caused the violation of Mr. Anthony's constitutional rights as herein described. The City's failure in this regard is particularly egregious in light of the degree to which it has been placed on notice that unless its police officers obtain more or improved training, the routine violation of individuals' constitutional rights will continue unabated.  Given the City's own inaccurate designation of certain lawful knives to be unlawful knives in 2010, as reported by the AKTI, it stands to reason that what gravity-knife training the City does provide to its police officers may not be substantively correct.

58.     In addition to Mr. Anthony's false arrest for gravity-knife possession, he was also falsely arrested for other fabricated offenses on the related complaint against him.  The existence of the City's unconstitutional customs and policies which permit, encourage and prompt similar false arrests and malicious prosecutions on a broad scale may be inferred from repeated occurrences of similar wrongful conduct as documented in civil rights actions filed in the United States District Courts in the Eastern and Southern Districts of New York as well as in New York State courts.  As a result, Defendant City of New York is aware (from said lawsuits as well as notices of claims and complaints filed with the NYPD's Internal Affairs Bureau and the CCRB) that many NYPD officers, including the Defendants, arrest individual persons in

order to meet productivity goals and arrest quotas; arrest individuals for professional advancement, overtime compensation and/or other objectives outside the ends of justice; and/or falsely arrest individuals and engage in a practice of falsification of evidence in an attempt to justify the false arrest.

59.    The Honorable Jack B. Weinstein, United States District Judge for the Eastern District of New York, has written that

> [i]nformal inquiry by the [C]ourt and among judges of this [C]ourt, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the [NYPD] . . . [T]here is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the [C]ity approving illegal conduct of the kind now charged.

Colon v. City of N.Y., 2009 WL 4263363, at *2 (E.D.N.Y).

60.    Former Deputy Commissioner Paul J. Browne, as reported in the press on January 20, 2006, stated that NYPD commanders are permitted to set "productivity goals," permitting an inference of such a custom or policy encouraging deprivations of individuals' constitutional rights in cases such as this one.

61.    Defendant City of New York is thus aware that its improper training and customs and policies have often resulted in a deprivation of individuals' constitutional rights.  Despite such notice, Defendant City of New York has failed to take corrective

action.  This failure caused Individual Defendants in this case to violate Plaintiffs' constitutional rights.

62.     Moreover, on information and belief, Defendant City of New York was aware, prior to the incident, that the Individual Defendants lacked the objectivity, temperament, maturity, discretion and disposition to be employed as police officers. Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train and supervise them.

63.     All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

64.     All of the aforementioned acts deprived Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

65.     The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as police officers, with the entire actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYPD, all under the supervision of ranking officers of said department.

66.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

67.     As a result of the foregoing, Plaintiffs are entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## FIRST CLAIM
## 42 U.S.C. § 1983

68.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

69.     Defendants, by their conduct toward Plaintiffs alleged herein, violated Plaintiffs' rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

70.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

71.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## SECOND CLAIM
## FIRST AMENDMENT RETALIATION

72.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

73.     Defendants violated the First and Fourteenth Amendments because Plaintiffs' exercise of their First Amendment rights substantially motivated Defendants' unconstitutional actions against them, and Plaintiffs suffered injury as a result.

74.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

75.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## THIRD CLAIM
## EQUAL PROTECTION

76.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

77.     Defendants violated Plaintiffs' Equal Protection rights because Defendants, motivated by constitutionally impermissible reasons, profiled Plaintiffs

for an unlawful stop and subsequential violations of their rights, and there was no justification for the same.

78.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

79.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

<u>**FOURTH CLAIM**</u>
<u>**FALSE ARREST AND UNREASONABLE SEARCH & SEIZURE**</u>

80.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

81.     Defendants violated Plaintiffs' Fourth and Fourteenth Amendments because they arrested and/or detained Plaintiffs without cause.

82.     Defendants violated the Fourth and Fourteenth Amendments because they unreasonably searched and seized Mr. Anthony, Ms. Calderon and the vehicle.

83.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

84.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## FIFTH CLAIM
## FABRICATION OF EVIDENCE/DENIAL OF CONSTITUTIONAL RIGHT TO FAIR TRIAL

85.   Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

86.   The Individual Defendants created false evidence against Mr. Anthony.

87.   The Individual Defendants forwarded false evidence to prosecutors in the District Attorney's Office and a jury would find that false evidence material.

88.   In creating false evidence against Mr. Anthony, and in forwarding false evidence to prosecutors, the Individual Defendants violated Mr. Anthony's rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

89.   Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Mr. Anthony of his constitutional rights.

90.   As a direct and proximate result of Defendants' unlawful conduct, Mr. Anthony sustained the damages hereinbefore alleged.

## SIXTH CLAIM
## FAILURE TO INTERVENE

91.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

92.     Individual Defendants actively participated in the aforementioned unlawful conduct but also observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

93.     Accordingly, Individual Defendants who failed to intervene violated the Fourth, Fifth and Fourteenth Amendments of the United States Constitution.

94.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

95.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## SEVENTH CLAIM
## MONELL CLAIM

96.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

97.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or

rule of the respective municipality/authority, which is forbidden by the United States Constitution.

98.     The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to, the inadequate screening, hiring, retaining, training and supervising of its employees that was the moving force behind the violation of Plaintiffs' rights as described herein.  As a result of the failure of the Defendant City of New York to properly recruit, screen, train, discipline and supervise its officers, including the Individual Defendants, Defendant City of New York has tacitly authorized, ratified and has been deliberately indifferent to, the acts and conduct complained of herein.

99.     The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to: arresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals.

100.   The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City of New York and the NYPD constituted deliberate indifference to the safety, well-being and constitutional rights of Plaintiffs.

101.   The foregoing customs, polices, usages, practices, procedures and rules of Defendant City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by Plaintiffs as described herein.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiffs respectfully request the following relief:

A. An order entering judgment for Plaintiffs against Defendants on each of their claims for relief;

B. Awards to Plaintiffs for compensatory damages against all Defendants, jointly and severally, for their violation of the First, Fourth, Fifth, Sixth and Fourteenth Amendment rights of Plaintiffs, the amount to be determined at jury trial, which Plaintiffs respectfully demand pursuant to FRCP 38;

C. Awards to Plaintiffs of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to the constitutional rights and welfare of Plaintiffs, the amount to be determined at jury trial, which Plaintiffs respectfully demand pursuant to FRCP 38;

D. Awards to Plaintiffs of the costs of this action, including reasonable attorneys' fees;

E. Such further relief as this Court deems just and proper.

DATED:      September 6, 2016
            New York, New York


_____/s_____
Ryan Lozar
305 Broadway, 10th Floor
New York, New York 10007
(310) 867-1562
ryanlozar@gmail.com

*Attorney for Plaintiffs*